656 F.Supp. 504 (1987)
LITTLE ROCK SCHOOL DISTRICT, Plaintiff,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT, et al., Defendants,
Mrs. Lorene Joshua, as Next Friend of Minors Leslie Joshua, et al., Katherine Knight, Individually and as President of The Little Rock Classroom Teachers Association (LRCTA), et al., Intervenors.
No. LR-C-82-866.
United States District Court, E.D. Arkansas, W.D.
March 20, 1987.
P.A. Hollingsworth, Philip E. Kaplan, Janet L. Pulliam, John M. Bilheimer, Little Rock, Ark., for plaintiff.
Wright, Lindsey & Jennings, Little Rock, Ark., Neal, Gerber & Eisenberg, Chicago, Ill., for Pulaski County Special School Dist. No. 1, Mac Faulkner, Bob Moore, Don *505 Hindman, Shirley Lowery, Sheryl Dunn and David Sain.
C.R. McNair, III, Asst. Atty. Gen., Sharon Streett, Dept. of Educ., Little Rock, Ark., for Arkansas State Bd. of Educ., Wayne Hartsfield, Walter Turnbow, Harry A. Haines, Jim Dupree, Dr. Harry P. McDonald, Robert L. Newton, Alice L. Preston, Jeff Starling and Earle Love.
Jack, Lyon & Jones, Little Rock, Ark., for North Little Rock School Dist., Bob Lyon, John Ward, Judy Wear, Leon Barnes, Marianna Gosser and Steve Morley.
Stephen L. Curry, Little Rock, Ark., for Grainger Williams, Richard A. Giddings, George A. McCrary, Buddy Raines and Dale Ward.
Theodore Shaw, New York City, John W. Walker, Little Rock, Ark., for intervenors Joshua, et al.
Richard Roachell, Cearley, Mitchell & Roachell, Little Rock Ark., for intervenors Knight, et al.

ORDER
HENRY WOODS, District Judge.
The Pulaski County Special School District (PCSSD) has submitted its student assignment plan (hereafter March plan); the Little Rock School District (LRSD) and the Joshua Intervenors have filed objections. I have serious questions whether the LRSD has standing at this point to object to PCSSD's intradistrict student assignment plan, except to the extent that elements of the PCSSD plan have interdistrict effects. Likewise, the Joshua Intervenors, none of whom attends school in the PCSSD, can only object to aspects of the plan which have an interdistrict effect. The one interdistrict effect cited by the LRSD is that the PCSSD student assignment plan will result in future white flight. The LRSD attributes this effect to so-called neighborhood schools in PCSSD and to "white havens," or predominantly white suburban areas in PCSSD that will attract whites wishing to escape desegregation. The neighborhood school argument is without merit. The LRSD's own plan submitted to and approved by this court calls for children to be assigned to the school closest to their homes so long as that assignment is compatible with desegregation efforts.
Nonetheless, the problem of white flight is troublesome. My original decision would have consolidated the school districts. It was my opinion that consolidation was necessary to remedy the years of white flight caused by the segregative practices of the school districts. It was also my belief that consolidation would provide the most effective and least burdensome method of desegregation since one consolidated district could rather easily have been divided into contiguous, racially integrated attendance zones. However, the court of appeals found consolidation too drastic a remedy. The court of appeals ordered the school districts left intact, thus mandating that a 76% white suburban school district surround a 42% white city school district. It is implausible to think whites will flee in any greater numbers to a 15% black school than to a 24% black school.
It is true that the ratio of blacks to whites in the March plan is less desegregative arithmetically than the PCSSD plan submitted in January (hereafter January plan). However, viewing the totality of the circumstances involved, the Court is convinced that the March plan will, in the long run, result in greater desegregation.
The inescapable fact is that, since the recent boundary change, the PCSSD is left with a geographically truncated district, extending over more than 700 square miles. South of the Arkansas River (the river) the PCSSD serves two noncontiguous areas, separated by a large area which was ceded to the LRSD in the boundary change. (Ironically, the area ceded included one of the few relatively integrated areas of the PCSSD.)
Integration of the PCSSD is seriously complicated by a second inescapable fact. Two-thirds of the blacks served by the PCSSD live in two geographic areas  one in the southeast part of Pulaski County, and one in the northeast. These two areas *506 together cover less than 100 square miles of this rambling district. Even with the transfer of the Granite Mountain area (populated overwhelmingly by blacks) the PCSSD is whiter today, at 24%, than it was when this lawsuit was filed five years ago. The court cannot ignore the fact that, even after the boundary change, the southeast sector of PCSSD (which has by far the highest percentage of blacks in that school district) is still whiter than the adjacent LRSD.
Given the peculiar demographics and geography of the PCSSD which this court is powerless to alter, the March plan represents a sound approach to desegregation. The PCSSD's change in policy regarding school expansion and new school sitings, its compensatory education proposal for schools which exceed 40% black, and its intradistrict specialty schools demonstrate a commitment to a course of conduct which can result in continuously improving racial ratios. The March plan is far superior to the January plan which surely would have resulted in integrated schools on paper only. After all, we are not dealing with checkers on a 700 square mile checker board, but with children. The January plan, with its 24-mile-one-way bus rides, was doomed to fail. The March plan, by contrast, offers the first glimmer of hope for a desegregated PCSSD.
The March plan divides the PCSSD into roughly three areas: a southeast sector, a southwest sector, and a north-of-the-river or northern sector. Each sector is roughly the geographic size of the new LRSD.
Elementary schools in the northern sector will range from 15-35% black with three exceptions, discussed below. The numbers are well within the guidelines set by the Eighth Circuit's mandate. It is also significant that schools with a lower than district-wide percentage of blacks will maintain the recommended 15% "critical mass" of students of the non-majority race.
Three northern sector elementary schools will be less than 15% black. Bayou Meto was designated as an "isolated school" under the long-ignored Zinnamon decree. It remains a thinly populated area, distant from any other center of population. It shall remain designated as "remote." The other two northern sector elementary schools with under 15% black enrollment, Oak Grove and Pine Forest, are currently overcrowded and in critical need of expansion. No existing school may be enlarged unless the enrollment in that school is reasonably projected to be within twenty (20) percent of the district-wide percentage of black or white students by organizational level, i.e., elementary, junior high and senior high. As a fail-safe measure, under no circumstance will a school with less than the district-wide percentage of blacks be enlarged unless the percentage of blacks living within reasonable proximity to the school has increased over that of the 1987-88 school year. This incentive to desegregate housing patterns is an effective approach to striking at the heart of segregation.
The variance from the district percentage of blacks in the junior high schools in the northern sector is less pronounced with the black percentage ranging from 14% to 29%, except for Oak Grove at 10%. The Oak Grove schools are currently overcrowded at all levels. The commitment to encourage desegregated housing patterns should aid in improving the ratio of blacks to whites. Similarly, the northern sector high schools range from 14-21% black, with the exception of Oak Grove, which will be 11% black.
The raw percentages in the southwest sector initially give rise to some concern. The three elementary schools, Lawson, Baker, and Robinson, will be 11%, 12%, and 13% black respectively. The one junior high, Robinson, is 10% black and the one senior high is 10% black. The March plan has several components designed to deal specifically with these schools. Baker is the closest of the three elementary schools to a center of black population. Baker is currently slated for before- and after-school child care to encourage the intra-district transfer of blacks who are in the southeast sector. Under the March plan, the district would provide transportation for black students whose parents wish to take advantage of this extended day care *507 program. The two proposed intra-district transfer categories which promote desegregation add a desirable element of choice. However, category III (S.A. Exhibit 1 at p. 11) is not a reassignment category which promotes desegregation. For hardship reassignments, the PCSSD should devise a case-by-case evaluation procedure. Any reassignment which is segregative in its effect should be justified and carefully documented.
Another of the many ironies of the recent boundary change is that the predominantly black community of Pankey was transferred from the PCSSD to the LRSD. Black students who live in Pankey presently attend the Robinson schools. PCSSD has begun an aggressive recruiting drive to retain these black students by use of the interdistrict majority-to-minority transfers. As previously ordered, transportation will be provided to these students. If successful, the retention of these black students should at least raise the percentage of blacks to the 15%, or "critical mass," level.
The southeast sector of the PCSSD, as noted, contains the largest percentage of blacks, as compared with the southwest and the northern sectors. The elementary schools are projected to be 54-56% black if all blacks who live in that sector attend school there. Likewise the junior high school, Fuller, would be 51% black and Mills High School would be 50% black. These schools are somewhat outside the guidelines set out by the Eighth Circuit Court of Appeals. For reasons set out below, the variance is justified.
At the outset, we again note that even those assigned to a 56% black elementary school in PCSSD will attend a whiter school than their neighbors in the adjacent LRSD (with a 64% elementary black enrollment). We must also bear in mind that all parties agreed that the interdistrict magnet schools should and would be 50% black. Certainly no one would label the magnets as "racially identifiable."
However, with that said, this court is ever mindful of the danger of sanctioning "separate but equal" schools. The fact remains that the PCSSD is but 24% black district-wide, and a 56% black student population is a significant variance. Several factors make the variance less troublesome.
PCSSD will have some 1200 seats allocated in the six interdistrict magnet schools. At least half of these seats will necessarily go to black PCSSD students. The March plan proposes the possibility of making the new school near Granite Mountain an intradistrict magnet (perhaps an "academy of excellence") to draw more white students into the southeast sector. The extended day care at Baker, discussed above, would also have a desegregative effect if properly and agressively implemented.
The PCSSD will construct no new schools unless the enrollment from the contiguous attendance area established or contemplated for the school is reasonably projected to be within twenty (20) percent of the district-wide percentage of black or white students by organizational level, i.e., elementary, junior high and senior high. In no event will a new school be constructed if the projected minority enrollment is less than ten percent.
Another important element of the March plan is compensatory education. All schools with enrollment exceeding 40% black qualify for special programming including: a reduction by 5% of the district average in teacher/student ratio; a 25% increase above the district average in per pupil expenditure; monitoring to insure that at least 85% of the students pass the state competency test and that 70% of the students achieve the district average on standardized tests and; remedial summer school, if warranted. The additional expenditures in these schools will amount to almost $800,000 annually.
The March plan contains additional safeguards. To insure that any change in the racial makeup of a school is toward desegregation, the PCSSD will annually monitor each school. If there is a change toward segregation of more than five percent (5%) in any school's racial ratio, immediate steps will be taken to reverse the trend. A change of only two percent (2%) in schools with initial black enrollment of less than *508 fifteen percent (15%) will require similar remediation. The PCSSD will provide to this court a copy of the annual monitoring reports on a school-by-school basis until further order of the court.
The court is convinced that the March plan can work. As with the other districts, success will result only when the district officials, the community, the parents, the teachers, and the children choose to make it work.
The time for rancor and cram-down plans has passed. The time for cooperation and creative solutions is at hand. Accordingly, the March plan is hereby accepted as amended by this order.