LITTLE ROCK SCHOOL
DISTRICT, Appellee,

Lorene Joshua, as next friend of minors Leslie Joshua, Stacy Joshua and Wayne Joshua; Rev. Robert Willingham, as next friend of minor Tonya Willingham; Sara Matthews as next friend of Khayyam Davis, Alexa Armstrong and Karlos Armstrong; Mrs. Alvin Hudson as next friend of Tatia Hudson; Mrs. Hilton Taylor as next friend of Parsha Taylor, Hilton Taylor, Jr. and Brian Taylor; Rev. John M. Miles as next friend of Janice Miles and Derrick Miles; Rev. Robert Willingham on behalf of and as President of the Little Rock Branch of the NAACP; Lorene Joshua on behalf of and as President of the No. Little Rock Branch of the NAACP, Appellants,

Katherine Knight, Individually and as President of the Little Rock Classroom Teachers Association (LRCTA); LRCTA; Ed Bullington, individually and as President of the Pulaski Association of Classroom Teachers (PACT); PACT; John Harrison, Individually and as President of the North Little Rock Classroom Teachers Association (NLRCTA); NLRCTA; Milton Jackson, Individually and as a Non–Certified Educational Support Employee of the Little Rock School District,

v.

PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1; North Little Rock School District; Murry Witcher; Ginny Jones; Vicki Stephens; Dixie Harrison; Larry Lazenby; and Rose Wilshire; Arkansas State Board of Education; Wayne Hartsfield; Walter Turnbow; Harry A. Haines; Jim Dupree; Dr. Harry P. McDonald; Robert L. Newton; Alice L. Preston; Jeff Sterling; Earle Love, Mac Faulkner; Bob Moore; Don Hindman; Shirley Lowery; Sheryl Dunn; David Sain; Bob Stender; Grainger Williams; Richard A. Giddings; George A. McCrary; Buddy Raines and Dale Ward, Charles Stratton; Mildred Tatum; Benny O'Neil, Mack McAlister, Appellees.

In re LITTLE ROCK SCHOOL
DISTRICT, Petitioner.

Nos. 87–1404, 87–1537, 87–1750, 87–1751, 87–1805, 87–1806, 87–1837, 87–1921, 87–2071, 87–2150, 87–2180, and 87–2371.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 3, 1987.

Decided Feb. 9, 1988.

Rehearing and Rehearing En Banc Denied
March 24, 1988.

Norman Chachkin, New York City, and John Walker, Little Rock, Ark., for appellant Joshua.

Phil Kaplan, Little Rock, Ark., for appellant Little Rock.

Richard Roachell, Little Rock, Ark., for appellant Knight.

Phil Neal, Chicago, Ill., for appellee PCSSD.

Randy McNair for appellee State of Arkansas.

Sam Perroni, Little Rock, Ark., for appellee Rayburn.

Phillip Lyon and Stephen Jones, Little Rock, Ark., for appellee North Little Rock.

Bob Cabe, Little Rock, Ark., for McKinney Intervenors.

Before HEANEY, ARNOLD, and WOLLMAN, Circuit Judges.

HEANEY [*], Circuit Judge.

We are asked in this appeal to review several decisions of the United States District Court for the Eastern District of Arkansas bearing on the desegregation of the three school districts in Pulaski County. After a careful review of the record, we reaffirm our order of November 5, 1987. We further hold: (1) that the March 1987 student assignment plan of the Pulaski County Special School District does not meet constitutional standards and that a new plan must be submitted by that district; (2) that compensatory education plans fully funded by the State of Arkansas must be promptly instituted in those Little Rock elementary schools that had a black student population equalling or exceeding 81% as of September 13, 1987; (3) that the District Court did not err in finding Little Rock School District in contempt for failing to comply fully with its orders relating to magnet schools and that the Joshua Intervenors will be given representation on the Magnet Review Committee;

---

[*] Judge Arnold wrote Sections I and II and contributed portions to other sections.

(4) that the District Court may set aside a negotiated teacher assignment plan only if the plan interferes with the overall plan to desegregate the schools of Pulaski County; (5) that the District Court's decision with respect to the relative seniority of former teachers of Pulaski County Special School District and Little Rock School District is vacated, and the parties are directed to proceed with arbitration unless the parties are able to resolve the dispute through negotiation; and (6) that in all other respects the decision of the District Court is affirmed.

Progress is being made towards establishing three independent but cooperating integrated school districts in Pulaski County. However, much remains to be done if all the children of that county, black and white, are at long last to receive the equal education entitled them. The lawyers, school board members, administrators, teachers, and parents can devote themselves to no nobler task than the quick and resolute removal of the last vestiges of segregation.

## I. THE DECEMBER 12 SPECIAL ELECTION IN LRSD

Little Rock School District (LRSD) appeals the District Court's order mandating a special school-board election for residents in two of its seven geographical zones on December 8, 1987.[1] The form and timing of elections to the LRSD Board of Directors came before the District Court after this Court ordered that a significant amount of land within the City of Little Rock, formerly part of Pulaski County Special School District (PCSSD), be assigned to LRSD. *Little Rock School Dist. v. Pulaski County Special School Dist. No. 1*, 778 F.2d 404, 435 (8th Cir.1985) (en banc), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986). Under Arkansas law, Ark.Code Ann. § 6–13–607 (1987), school districts which have an average daily attendance in excess of 24,000 must be divid-

ed into geographic zones for the purpose of electing school-board members. Before the adjustment of the boundaries between PCSSD and LRSD in 1985, LRSD's seven school-board members were elected at large; afterward, LRSD's enrollment increased beyond 24,000 as a result of its annexation of territory from PCSSD. Consequently, LRSD was obligated under state law to change its form of governance to representation by zones, and it submitted a proposal for doing this for approval by the District Court as part of its general desegregation plan in December, 1986.

The District Court issued an order on December 18, 1986, approving LRSD's election plan, which divides the District into seven contiguous zones of roughly equal population. No party has challenged the substance of LRSD's court-approved plan, nor does any party question the District Court's authority to review its terms. We therefore proceed on this appeal on the assumption that the District Court's 1986 approval of LRSD's plan was proper.

■ LRSD's present appeal concerns a one-time problem in managing the transition from at-large to zoned representation. The District Court approved LRSD's proposal to allow previously elected at-large incumbents to serve out their terms. Since the terms of LRSD board members are staggered, this provision created the temporary anomaly that seats previously held by at-large board members would become available to be filled by zone representatives only on a piecemeal basis. In other words, some zones would be able to place resident representatives on the Board before others. This comparative disenfranchisement of some LRSD zones appeared all the more acute in light of the fact that four of the seven zones lacked residents who served as incumbents at large.

To correct this apparent inequity, the District Court approved LRSD's proposal that the two seats which would become vacant in March, 1987, be filled by repre-

---

**1.** This issue is raised in No. 87–2363. By opinion filed and judgment entered on November 5, 1987, 833 F.2d 112, we announced our decision affirming the order of the District Court. At that time we said that an opinion giving reasons for that result would be filed later. This is that opinion.

sentatives elected from two "enhanced election zones," composed of‑pairings of the four zones which lacked resident incumbents. In March, 1987, LRSD Zones 1 and 6 jointly elected a resident of Zone 1; Zones 5 and 7 jointly elected a resident of Zone 5. Under LRSD's court-approved proposal, the next two vacancies on the board, open in March, 1988, would be filled by representatives elected, respectively, from Zones 6 and 7, the two zones without resident board members. At this point, each of the seven zones would have a resident serving on the board, and the transition to LRSD's zoned representation plan could proceed without further complications.

Thus far, LRSD's baroque scheme for the transition between representation plans was uncontroversial. Two subsequent events disrupted this equilibrium. After the District Court's December 18, 1986, order approving LRSD's proposal for March 1988 elections for zones without resident incumbents, the Arkansas Legislature passed Act 969 of 1987, which changed the date of annual school elections in Arkansas from March to September. At about the same time, the LRSD superintendent resigned, and the LRSD board's selection process for a new superintendent began in July, 1987. Four LRSD patrons who reside in Zones 6 and 7 moved to intervene, concerned that the Legislature's six-month postponement of their zones' school-board elections would deny the voters in their zones representation in the Board's "crucial" selection of a new superintendent.

The District Court issued an order on October 1, 1987, requiring the postponed elections for Zones 6 and 7 to be moved to December 8, 1987.[2] The Court did not end the terms of any incumbents, but instead provided that the LRSD Board would temporarily become a nine-member body between the December 1987 elections and the expiration of the terms of two incumbents in March, 1988. LRSD now appeals the District Court's order, claiming that the District Court abused its discretion by al-

tering the state-imposed election date without evidence of an independent constitutional violation.

We affirm the District Court's order. We need not decide whether the federal Constitution requires LRSD to hold elections for Zones 6 and 7 earlier than September, 1988. The District Court's decision to move the election date up did not require a finding of liability for constitutional violation, since the court's October 1, 1987, order was merely an adjustment of the court's original approval of LRSD's plan to hold elections in March, 1988. No party is challenging either the wisdom of the court's original decision to approve LRSD's election plan or the court's authority to make such a decision. We conclude that the District Court was simply exercising its equitable power to administer remedial orders, and so we need determine only whether the court abused its discretion in advancing the date of the elections originally scheduled for March, 1988. We find no abuse of discretion in the court's minor adjustment of its otherwise unchallenged order approving LRSD's governance plan. Similarly, the District Court did not abuse its discretion in conditionally granting the Rayburn petitioners' motion to intervene for the purposes of arguing this appeal, especially since this intervention is now mooted by our disposition of the appeal on the merits.

It is true, as LRSD argues, that the District Court's order gives residents of Zone 6 and 7 some temporary edge in representation on the board for the three-month period between December, 1987 and March, 1988. For this period of time, residents of these two zones will have two resident board members, and two other board members, though not residents of Zones 6 or 7, will have been chosen in an election in which those residents (along with residents of Zones 1 and 5) have voted. On the other hand, in the absence of action by the District Court, an additional six months (from March to September,

---

2. The order also provided that Zone 3 would elect a representative on December 8, 1987. This particular aspect of the District Court's

order is not questioned by any party on this appeal.

1988) would have passed before all zones had a resident representative. In either event, the original 1986 election plan could not stand unchanged because of the unforeseen action of the Legislature in changing the date of school elections. The District Court had a choice to make between different kinds of change in its original plan. Each choice involves some dislocation and arguably falls short of complete justice. In making the choice it did, the District Court deliberately weighed the competing equities and reached a conclusion that is within the limits of reasoned discretion. We affirm on this issue.

## II. DISQUALIFICATION OF THE TRIAL JUDGE

We turn now to the arguments made by LRSD and the Joshua Intervenors that the District Court should have granted their motion for recusal.[3] Appellants argue, first, that recusal of the trial judge is mandatory under 28 U.S.C. § 455(b)(2), which requires federal judges to disqualify themselves "[w]here ... a lawyer with whom [they] previously practiced law served during such association as a lawyer concerning the matter [in controversy]...." During the trial judge's private law practice, one of his law partners represented parties who ultimately participated as *amici curiae* in *Clark v. Little Rock School Dist.*, No. LR–C–64–55 (E.D.Ark., filed Nov. 4, 1964), and LRSD now argues that this fact triggers the recusal requirement of § 455(b)(2).

Along with *Zinnamon v. Pulaski County School Dist.*, No. LR–C–68–154 (E.D. Ark., filed Aug. 7, 1968), *Davis v. North*

*Little Rock School Dist.*, No. LR–C–68–151 (E.D.Ark., filed Aug. 5, 1968), and the instant case, *Clark* is one of the cases involving intradistrict segregation in the school districts of Pulaski County. Although the *Clark* litigation is entirely dormant,[4] it is clear that the case forms part of the historical background of the dispute presented here.

In order to avoid the appearance of impropriety, the District Court (having first consolidated all the related cases) severed *Clark* from the consolidated litigation involving *Zinnamon, Davis,* and the present case, and returned it to the docket of another judge. LRSD's first line of attack is to argue that the court abused its discretion in severing *Clark*, and that the allegedly mandatory consolidation of *Clark* requires the court to recuse itself from the entire litigation. We are not persuaded. The consolidation and severance of related cases under Fed.R.Civ.P. 42 is a matter of judicial housekeeping for the District Court, and we have no reason to interfere with the management of its docket. In particular, we find no abuse of discretion in the court's decision to sever *Clark*, especially where LRSD's appeal fails to supply any compelling reason why justice requires the consolidation of these cases.[5] By severing *Clark*, the District Court enabled itself to continue handling the present interdistrict case, thus avoiding the ruinous delay, expense, and confusion that assignment of a new judge would have caused.

We have previously held, in an appeal involving the same judge and the same connection with *Clark*, that where the trial

3. Our opinion filed November 5, 1987, announced our decision not to require disqualification of the trial judge and gave a brief statement of reasons. This opinion elaborates on that statement.

4. Most of the activity in *Clark* occurred within the first ten years after its commencement in 1964, and it was during this period that the trial judge's former law partner represented clients as *amici curiae*. The last ruling in *Clark* occurred in 1983. 705 F.2d 265 (8th Cir.1983). As in any case involving equitable remedies, it is theoretically possible that some future violation could trigger further litigation in this case, but

for all practical purposes, *Clark* must be considered closed.

5. For the same reasons, we reject the Joshua Intervenors' claim that the District Court erred when it originally granted LRSD's motion to consolidate the four desegregation cases in Pulaski County. Any harm to which the Joshua Intervenors point is largely speculative. If any realignment of the parties on certain issues is prudent, one of the parties may make a motion for such realignment when the need arises. On this record, however, the District Court has not abused its discretion in refusing to realign the parties.

court denies consolidation of a related case which might have provided a basis for recusal, "... it follows ... that the 'matter in controversy' here cannot be the same ... and that the statutory language on recusal ... thus does not apply." *Patterson v. Masem,* 774 F.2d 251, 254 n. 2 (8th Cir. 1985). *Patterson* involved an individual racial-discrimination suit by an employee of LRSD, and the Joshua Intervenors urge us to distinguish *Patterson* on the ground that this case is intertwined with *Clark* in a way that *Patterson* was not. Under the Joshua Intervenors' interpretation, the "matter in controversy" contemplated by the recusal statute may extend beyond the litigation conducted under the same docket number where the issues in dispute are sufficiently related. Since this case inevitably involves consideration of desegregation within LRSD—the focus of the *Clark* litigation—the Joshua Intervenors conclude that § 455(b)(2) requires recusal.

Even if we accept appellants' argument that different cases may constitute the same "matter in controversy," an interpretation apparently precluded by *Patterson,* the question of what kinds of cases are sufficiently related for the purposes of § 455(b)(2) would remain a question of judgment and degree. We cannot say that the trial judge's former law partner's submission of an *amicus* brief in a case involving, to a large extent, different issues and different remedies two decades ago requires recusal under § 455(b)(2), nor do we believe that Congress intended such a result.

■■■ There is a more troubling ground for recusal urged by LRSD and the Joshua Intervenors. These appellants point to several instances of inappropriate conduct by the trial court over the past year, including the court's rejection of PCSSD's January plan without a hearing and its impromptu meeting with LRSD students at which the trial judge publicly criticized LRSD's teacher assignment plan prior to the issuance of his April 15th show-cause order. Appellants urge that the trial judge must be directed to recuse himself,[6] because "his impartiality might reasonably be questioned" within the meaning of 28 U.S.C. § 455(a) as a result of his conduct.

At the outset, we note the irony that most of the major parties to this litigation have at some point sought the removal of the trial judge. Not surprisingly, the parties have generally discovered grounds for disqualification at approximately the same times that the District Court has ruled for their adversaries on the merits. The recusal statute does not provide a vehicle for parties to shop among judges. Nor does § 455(a) require recusal every time a judge commits a procedural error or departs from protocol in some way. If it did, it would be extremely difficult for any human being (a category that includes judges) to preside for the duration of a case as complex and protracted as this one.

The question posed in motions for recusal under § 455(a) is not whether the trial judge committed errors, but whether these errors create a reasonable inference that the Court has lost its impartiality. This question must be answered "... in light of the full record, not simply in light of an isolated incident." *In re Federal Skywalk Cases,* 680 F.2d 1175, 1184 (8th Cir.), *cert. denied,* 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982). While the District Court at times acted hastily and, we hold, erroneously, we do not find that these actions betray bias or partiality on the part of the trial judge.[7] No reasonable assessment

---

**6.** The Joshua Intervenors raise this argument in the form of an appeal from the District Court's denial of their motion for recusal. LRSD brings the argument through a petition for mandamus directed to this Court seeking an order directing recusal, a petition supported here by the Joshua Intervenors.

**7.** Unlike the trial judge in *Reserve Mining Co. v. Lord,* 529 F.2d 181 (8th Cir.1976), the District Court cannot reasonably be said "... to have

shed the robe of the judge and to have assumed the mantle of the advocate." *Id.* at 185. In this sense, the conduct of the District Court more closely resembles that of the trial judge in *In re Federal Skywalk Cases, supra.* In that case, we found that the trial judge's *ex parte* communications with counsel concerning possible representation for a class which had not yet been certified were clearly improper. We found, however, that this impropriety did not indicate that the judge had lost the ability to act impar-

of this grueling litigation, in light of the full record, would conclude that the District Court is predisposed to reject the claims of LRSD or the Joshua Intervenors. On the central issue before the Court in this case prior to remand—namely, the availability of consolidation as an interdistrict remedy—the District Court ruled for LRSD (a ruling we later reversed).

To say that the District Court's errors do not create an appearance of bias should not, in retrospect, obscure the fact that the court did commit errors, most notably in rejecting PCSSD's January plan without a hearing. We are especially disturbed by the language used by the court in announcing (in advance of any hearing on the question) that it would not approve PCSSD's January student assignment plan. Although the court disclaimed being influenced by public clamor, its open acknowledgement of the receipt of letters and phone calls (all *ex parte*) denouncing the plan left quite another impression. Constitutional rights are at stake here, and those rights exist (or not, as the case may be) independently of public opinion. The right most prominently involved here is the right to a public education free of racial discrimination. That right, like the right "to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights[,] may not be submitted to vote; [it] depend[s] on the outcome of no elections." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).

It may be that public reaction to a student assignment plan should be taken into account, and that such reaction might be a factor, at the margin of decision, for choosing one plan above another. See *Clark v. Board of Education of the Little Rock School Dist.*, 705 F.2d at 271 ("Although the possibility of white flight and consequent resegregation cannot justify a school board's failure to comply with a court order to end segregation, ... it may be taken into account in an attempt to promote integration.") (citations omitted). But to the extent that public reaction is relevant, what that reaction is is still a question of fact, to be decided by the District Court after appropriate notice and a full evidentiary hearing. Public outcry in response to media publicity may be uninformed, even distorted. It is not a reliable basis for adjudication. We reject respondent's position that public reaction was a proper subject for judicial notice. It is not the sort of "fact" that is either so clear-cut or so easily established as to justify short-circuiting the normal fact-finding process. The tensions which make strict adherence to the canons of judicial conduct so difficult—hostile public comment, destructive bickering between the parties—are the very reasons which make these procedural formalities so imperative. Advocates and parties need a predictable rule-based process for adversarial litigation, and the sudden appearance of less structured forms of dispute resolution, such as the summary rejection of proposed remedies, inevitably disorients the participants.

Having said all this, we nevertheless believe firmly that the District Court's lapses resulted, not from bias, but from the more honorable impulse to cut through the tangle of litigation to reach effective solutions for the troubled school systems in Pulaski County. Although the District Court did commit errors, we are confident in the ability of the distinguished trial judge to continue adjudicating this trying litigation. We do not expect that the errors complained of will recur, and we deny LRSD's petition for mandamus and affirm the trial court's order denying recusal.

## III. STUDENT ASSIGNMENTS IN PCSSD

On January 1, 1987, PCSSD submitted a student assignment plan (the January plan) based upon the new boundaries between PCSSD and LRSD established by the District Court pursuant to the mandate in *Little Rock School District v. Pulaski County Special School District*, 805 F.2d 815 (8th Cir.1986) (per curiam). Based on the projected enrollments, the January plan

tially, and we therefore refused to order his recusal.

would have provided that each school in PCSSD would range from 20% to 40% black[8] student population. At a hearing on magnet schools held on February 17, 1987, the District Court informed the parties, without prior notice, that it would reject the January plan because of excessive busing and adverse community reaction.[9] The District Court reached this decision without conducting a hearing or taking any evidence. On March 5, PCSSD submitted a revised student assignment plan, which divided the District into three noncontiguous sectors of widely varying racial composition. Since the plan contemplated assigning students only to schools in the sector in which they reside, the projected enrollments reflected the racial makeup of the residents of each sector, rather than of the District as a whole. Under the March plan, the southeast sector of PCSSD would have a black student population of 50–55%,[10] while the southwest and north sectors would have schools averaging only 11% and 18% black enrollment, respectively. Over the objections of the LRSD and the Joshua Intervenors, the District Court approved PCSSD's March plan. *Little Rock School District v. Pulaski County Special School District*, 656 F.Supp. 504 (E.D.Ark.1987) (order).

We reverse the District Court's approval of PCSSD's March plan, because the plan permits a constitutionally impermissible continuation of a dual educational system in PCSSD. Furthermore, we conclude that the District Court abused its discretion in rejecting the January plan without a hearing. While many details of PCSSD's original proposed remedy have yet to be worked out, we direct on remand that consideration of student assignment in PCSSD resume within the general outlines in the January plan, subject to appropriate modifications, including limits on busing time, which we discuss below.

Much of the confusion over the bounds of the acceptable variation from the district-wide average in the racial composition of school enrollments stems from a dispute over statistical method. In our en banc opinion, this Court ordered the school districts to revise their attendance zones so that each school would reflect the racial composition of its district, subject to a permissible variance of up to one-fourth of either race. 778 F.2d at 435. As a matter of simple arithmetic, however, it makes a great deal of difference whether the benchmark for the one-fourth variance is the minority race or the majority race.[11] The District Court apparently calculated the ±25% variance from the percentage of

8. One remote school, Bayou Meto, would remain virtually all-white, pursuant to an exception to district-wide desegregation ratios created by this Court in its en banc opinion. 778 F.2d at 435–36.

9. The Court stated in pertinent part:

In fairness to the Pulaski County Board and officials of that District, I must advise you that I will not approve the student assignment plan submitted by the Pulaski County District. This plan contemplates an inordinate amount of busing of both black and white children. It has the violent opposition of a large segment of the patrons in the District, both black and white.

My office has been flooded with mail and telephone calls in opposition to the proposed plan. While I do not decide cases in response to public clamor, it is obvious there must be some public support of a student assignment plan. Otherwise, white flight to private schools and to schools in other counties will destroy the racial balance we seek to achieve and seriously harm the well-being of the County School system.

Contrary to impressions cultivated by some of your District officials and others with their own axes to grind, the Federal Courts have had no input whatsoever into the plan advanced by the Pulaski County District. This is not my plan or the plan of the Court of Appeals. In my opinion, it's a poor plan. I have repeatedly stated in open court that a minimum of busing should be employed as long as constitutional requirements are met.

10. The southeast sector includes the largely black Granite Mountain area, which we held in our en banc opinion had been unconstitutionally deannexed from PCSSD to LRSD as a means of segregating black pupils in the LRSD. 778 F.2d at 427–28.

11. If schools in the 76% white PCSSD are allowed to under- or over-represent the majority race by as much as one-fourth, the acceptable range would be 57%–95% white. On the other hand, if the variance is calculated as the range between three-fourths and five-fourths of the district-wide minority ratio, the acceptable range becomes 18%–30% black.

white students in the PCSSD when it held that the schools in the two predominantly white sectors were "well within the guidelines set by the Eighth Circuit's mandate." 656 F.Supp. at 506.

This Court did not intend its ±25% guideline to allow such wide variations. Our en banc order directs that variation in the enrollments of each school may not exceed one-fourth the district-wide percentage of either race, and the minority race is here the statistically relevant focus of the variance. In concrete terms, this guideline, as applied to the 24% black PCSSD, translates to a presumptive permissible variation of 18%–30% black enrollment in PCSSD schools.

We emphasize that our en banc opinion prescribed the one-fourth variance as a guideline for the subsequent remedy, and not as a rigid quota. "[T]he use made of mathematical ratios [is properly] no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement." *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). There are practical limits to the remedial use of desegregative student assignments, particularly where the time or distance of travel risks damage to the health and education of school children.[12] See *Swann*, 402 U.S. at 30–31, 91 S.Ct. at 1283. This Court has previously approved an assignment plan to desegregate LRSD which would require transportation time of up to forty-five minutes each way, *Clark v. Board of Education of Little Rock School Dist.*, 465 F.2d 1044, 1046 n. 5 (8th Cir. 1972), *cert denied*, 413 U.S. 923, 93 S.Ct. 3054, 37 L.Ed.2d 1044 (1973), and this forty-five minute limit on busing appears to be a sensible cap for purposes of desegregating PCSSD schools.

■ Against this background, we cannot affirm the District Court's approval of PCSSD's March plan. The variation in black enrollment from 11%–18% in the southwest and north to 50% in the southeast extends far beyond the acceptable variation outlined in our en banc opinion. In a system with a history of segregation, there is a need for specific and effective remedial criteria, and courts must apply a presumption of unconstitutionality against schools in previously segregated systems which remain substantially disproportionate in their racial composition. *Swann*, 402 U.S. at 26, 91 S.Ct. at 1281.

■ As a general rule, the geographic separation of black and white residential areas within the same school district does not release a constitutional violator from the duty to desegregate the district's schools as a unit. The local autonomous school district is the basic governmental unit of American public education; accordingly, respect for the autonomy of the school districts has been the chief reason that the federal courts have avoided ordering their dissolution as a remedy for inter-district segregation. See *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*); *Little Rock*, 778 F.2d at 434. Three years ago, PCSSD persuasively argued against its three-into-one consolidation with LRSD and NLRSD on the ground of status as an integral unit of local governance. For essentially the same reason, it cannot now defend its proposed one-into-three partition on the ground that it is incapable of implementing integral district-wide desegregation.

In this sense, PCSSD's tripartite March desegregation plan resembles the remedy that the Supreme Court found inadequate in *Davis v. School Commissioners of Mobile County*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). In *Davis*, the Fifth Circuit had ordered a desegregation plan which divided Mobile County into two separate sections divided by the county's central highway, and which treated the desegregation of the schools in the 65% black east side and the 12% black west side of Mobile as two separate processes. The Supreme Court reversed, on the ground that the Fifth Circuit erroneously "... felt con-

---

12. Hence our ongoing exception of the geographically remote Bayou Meto School, which is practically all white, from the general guideline.

strained to treat the eastern part of metropolitan Mobile in isolation from the rest of the school system, and that inadequate consideration was given to the possible use of bus transportation and split zoning." *Id.* at 38, 91 S.Ct. at 1292. PCSSD's March plan involves the same remedial shortcomings present in *Davis,* and we therefore reverse the District Court's order approving the plan.

On remand, the District Court should develop a remedy which does not create separate subdivisions within PCSSD, and which brings the racial composition of each PCSSD school (with the exception of Bayou Meto) within the permissible variance outlined here. As a preliminary matter, this formula appears to describe the general outlines of PCSSD's original proposed remedy—the January plan—which was improperly rejected by the District Court. We note that the Joshua Intervenors, who are the sole representatives of the victims of the constitutional violations at issue here, found the January plan to be conceptually satisfactory. Of course, we do not reach any conclusions in advance about the particular features of an appropriate student assignment plan for PCSSD—we simply direct that consideration of the remedy resume at the point it was erroneously interrupted in February 1987.

The District Court should conduct hearings and take evidence on any and all factors, including busing time, which may limit the effectiveness of the remedy. The District Court may allow deviation beyond the 18%–30% range in black enrollment if necessary to keep one-way busing times within the forty-five minute limit approved in *Clark.* In the hearings, however, PCSSD, as the past constitutional violator, must bear the burden of proving that its

proposed plan "... promises realistically to work *now,*" *Green v. County School Board,* 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968), and that any limitations placed on the desegregative effect of the remedy are required to "... serve important and legitimate ends." *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979).[13] The hearing on remand should be conducted promptly, with a view to putting an effective student-assignment plan in place for the school year 1988–89.[14]

## IV. COMPENSATORY PROGRAMS IN THE LRSD

In this court's en banc opinion, we stated that:

If the four all- or nearly all-black elementary schools as conditionally allowed by ... *Clark v. Board of Education of Little Rock,* 705 F.2d 265 (8th Cir.1983), are retained in LRSD, compensatory and remedial programs of the type that we required for the nonintegrated schools in St. Louis shall be put into effect for the four schools. *See Liddell v. State of Missouri,* 731 F.2d [1294] at 1312–18 [8th Cir.1984]. The additional cost of these programs shall be paid for by the State of Arkansas.

*Little Rock,* 778 F.2d at 435.

On remand, LRSD developed a new student assignment plan. That plan modified the enrollment in the previously all-black schools to the point that no elementary school in LRSD was entirely black. Several schools, however, would be racially identifiable as black schools. LRSD asked the District Court to fund compensatory programs[15] in all LRSD elementary schools,

---

**13.** We disapprove the District Court's procedural approach in the hearings leading up to its approval of the March plan. There the Joshua Intervenors bore the burden of presenting their expert witness, Dr. Stolee, to attack the March plan, and the PCSSD's expert witness, Dr. Welch, testified in rebuttal. The District Court erred in implicitly placing the burden on the Joshua Intervenors to disprove the effectiveness of the PCSSD's plan.

**14.** For this reason, among others, we are directing that our mandate issue forthwith. To avoid disruption, the plan now in use may remain in effect for the remainder of the school year 1987–88.

**15.** The proposed compensatory programs were: Early Childhood Education; Compensatory Reading, Mathematics, and Learning Skills; Extended Day; Summer Learning Opportunities; Parent Education and Involvement in Schools; Guidance and Counseling; Social Work; Diag-

contending that the black students in these schools were in need of compensatory and remedial training because they had been deprived of their constitutional rights for so many years. The District Court denied implementation and funding of the compensatory programs, concluding that "[t]here are no all-black schools in the LRSD student assignment plan, [and therefore] the conditions are not present which would trigger state financing of compensatory education...." *Little Rock School Dist. v. Pulaski County Special School Dist. No. 1,* 659 F.Supp. 363, 366 (E.D.Ark.1987) (order).

■ In using the phrase "all- or nearly all-black," it was our intention to provide comprehensive remedial and compensatory programs to students in racially identifiable black elementary schools. A racially identifiable black elementary school has been defined as "[a] school having a black student enrollment in excess of the applicable range of variance from the system-wide percentage of black pupils...." *Penick v. Columbus Board of Education,* 583 F.2d 787, 799 (6th Cir.1978), *aff'd,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). Applying this standard to the instant case, we define a racially identifiable black elementary school in LRSD as any elementary school that is 81% or more black (rounded up or down to the nearest whole number).[16]

In our view, the District Court erred in holding that the state was not obligated to fund remedial and compensatory programs in these racially identifiable elementary schools in LRSD. This holding is consistent with precedent. *See Milliken v. Bradley,* 433 U.S. 267, 284–86, 97 S.Ct. 2749, 2759–60, 53 L.Ed.2d 745 (1977) (*Milliken*

*II* ); *see also Liddell v. State of Missouri,* 731 F.2d 1294, 1312–18 (8th Cir.), *cert. denied,* 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984); *Arthur v. Nyquist,* 712 F.2d 809, 811 (2d Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984); *Oliver v. Kalamazoo Board of Education,* 640 F.2d 782, 789–90 (6th Cir.1980); *Evans v. Buchanan,* 582 F.2d 750, 767–69 (3d Cir.1978) (en banc), *cert. denied,* 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). Such measures "are an integral part of a program for compensatory education to be provided Negro students who have long been disadvantaged by the inequities and discrimination inherent in the dual school system." *Milliken II,* 433 U.S. at 284, 97 S.Ct. at 2759.

The programs to be implemented in the racially identifiable black elementary schools in LRSD should be similar to those required for the non-integrated schools in St. Louis, *see Liddell,* 731 F.2d at 1312–18, but carefully tailored to meet the needs of Little Rock students. The most important element of the compensatory and remedial programs should be the reduction of class size in the racially identifiable black elementary schools to 20 pupils per teacher. This reduction must be achieved over a period of three years; other approved compensatory and remedial programs may be phased in over a reasonable period of time to be fixed by the District Court.

The racially identifiable black elementary schools shall be those having a black student population of 81% or more as of September 13, 1987.[17] The elementary schools so identified shall continue to have that status for a period of years equal to the number of grades they contain, notwith-

---

nosis and Prescription; Library/Media Services; and Alternative Schools. LRSD Desegregation Plan 114, 130–39.

16. Applying the same 25 percent minority variance that we did in Pulaski County (±6 percent) to the 75%–25% black-white ratio in LRSD elementary schools, we end up with the 81% standard.

17. This date is selected because it appears to be the date as of which attendance was computed

for state-aid-to-schools purposes. See Ark.Code Ann. § 6–18–213 (1987). We realize that some changes in racial ratios occurred later in the school year. These changes, however, did not have a pronounced effect on any of the racially identifiable schools, measured as of September 13, 1987. Any date selected will be arbitrary in some sense, but a definite date must be fixed to avoid manipulation and give the parties certainty as to what is being ordered.

standing enrollment changes.[18] These limitations are imposed to discourage manipulation of enrollments within LRSD and should not discourage efforts on the part of LRSD to reduce the black population in these schools to the district-wide average.

■ LRSD and the Joshua Intervenors argue that compensatory and remedial programs should not be limited to racially identifiable schools. They point out that all black students, not just those in certain schools, have been victims of unconstitutional segregation. The point is well taken. In the Kansas City and St. Louis cases remedial programs were not limited to non-integrated schools, though we directed that they take a more intensified form in those schools. See *Jenkins v. State of Missouri*, 807 F.2d 657, 682–86 (8th Cir.1986) (en banc); *Liddell*, 731 F.2d at 1316–19. The State of Arkansas is no less guilty of past constitutional violations than the State of Missouri, and it should be liable for a comparable remedy.

In so holding we are not violating the law-of-the case doctrine or departing from the provisions of our previous en banc opinion in this case, as the State contends. If we place this case in context, the point becomes clear. The complaint that initiated the lawsuit was filed by LRSD against PCSSD, NLRSD, and the State. It sought relief for interdistrict violations of the Constitution by those defendants. It was not primarily concerned with intradistrict violations, or with the intradistrict effects of the defendants' acts. Therefore, the relief contained in our en banc opinion was designed to cure the interdistrict effects of what the defendants had done. It was not intended to address comprehensively the intradistrict effects in LRSD of State-imposed segregation and its residue. *See* 778 F.2d at 435 n. 20, 436 n. 21. But it cannot be denied that the State has also committed *intradistrict* violations, as a consequence of which the black children of LRSD (and the white children, too, for that matter) have been deprived, in varying degrees and from time to time, of their federal constitutional right to a desegregated public education. Accordingly, it is appropriate for relief to include compensatory and remedial programs in LRSD schools that are not racially identifiable.

Accordingly, the Joshua Intervenors and LRSD may apply to the District Court for additional compensatory or remedial programs in the non-racially identifiable schools at the elementary, junior high, and senior high levels. These programs need not include a reduction in class size but shall otherwise be generally comparable to those approved by this Court for implementation in the St. Louis and Kansas City schools. Our St. Louis and Kansas City en banc opinions should also be used as guidelines for the funding of these programs. By referring to these opinions we do not mean to require that the details of the St. Louis and Kansas City programs be transplanted in their entirety to Little Rock. The District Court shall determine in its discretion what programs are necessary to remedy the effects of intradistrict segregation on students in the non-racially-identifiable schools. It shall determine what part of the funding of such programs shall be paid for by the State. Each entity responsible for the unconstitutional conditions should bear its fair share. Some parts of the plan may be appropriate for full State funding; other parts may appropriately be split between the State and LRSD.[19] The District Court should decide all these issues in the first instance.

On remand, LRSD shall promptly prepare and submit to the District Court its plan for compensatory and remedial programs in the racially identifiable black ele-

---

18. Thus, if a school contains grades K through six, the compensatory and remedial program at that school must last for at least seven years. In this way, students who enter kindergarten in the fall of 1988 will get the benefit of the program for their full time in a given school (assuming their assignment is not changed for some good reason).

19. The programs of which we are now speaking —those in non-racially-identifiable schools—are the remedy for intradistrict violations committed by the State and LRSD. Accordingly, neither PCSSD nor NLRSD shall be required to pay any part of their cost.

mentary schools and a time schedule for the implementation of these programs. If any party objects, the District Court shall conduct an evidentiary hearing and issue appropriate orders. If LRSD or the Joshua Intervenors move for other forms of compensatory and remedial relief, the District Court shall conduct an evidentiary hearing on this motion also and issue appropriate orders.

## V. MAGNET SCHOOLS

### A. *Background*

In this Court's en banc opinion of November 7, 1985, we set forth in detail the interdistrict constitutional violations on the part of the State of Arkansas, PCSSD, and NLRSD. *Little Rock,* 778 F.2d at 427–429. (This Court had previously set forth the constitutional violations of LRSD in *Clark v. Board of Educ.,* 426 F.2d 1035 (8th Cir. 1970) (en banc), *cert. denied,* 402 U.S. 952, 91 S.Ct. 1608, 29 L.Ed.2d 122 (1971)).

We included in the remedy the establishment of magnets to alleviate the interdistrict violations:

> The district court may require a limited number of magnet or specialty schools or programs to be established at locations to be determined initially by a Magnet Review Committee and approved by the district court after a hearing.... The magnet schools, if ordered, shall be administered by a Magnet Review Committee with one person to be named by

each school district and two persons to be named by the State of Arkansas. The State of Arkansas will be required to pay the customary state aid to any pupils attending these schools, plus an additional one-half of the cost of educating the students attending them. The local share of the cost of any magnet school established shall be paid by the three participating schools on a basis to be determined by the district court. The state shall also be required to pay one-half of the cost of the construction or rehabilitation necessary to house the magnet schools and the full cost of transporting any students who attend them.

*Little Rock,* 778 F.2d at 436.

We went on to state that the programs for the magnet schools should be similar to those described in *Liddell,* 731 F.2d at 1305–12:

> Magnet schools ... will be distinguished by the features that have made them successful in other cities: individualized teaching, a low pupil-teacher ratio, specialized programs tailored to students' interests, enriched resources and active recruitment.

*Little Rock,* 778 F.2d 436 n. 21.

We specifically noted in our en banc opinion that PCSSD and NLRSD had made thoughtful proposals for magnet schools and programs, with the expectation that the programs suggested would be seriously considered.[20]

---

**20.** *PCSSD* suggested twenty-nine program offerings:

the creation of a "substantial number of special schools and special program offerings ... in each of the three present school districts," in addition to the traditional curriculum offered at "standard schools." * * * Suggested themes for specialty schools and programs in elementary schools include a gifted and talented program, a physical development program, a multi-language program, a lab school, a Piaget model school, an extended school day center, a Montessori school, a creative arts school, a personalized education program and a computer/science/math program. Junior high school themes include a gifted and talented program, visual communication, pre-international Baccalaureate program, physical development, arts program, ecology and environmental education, and math/science. Senior high school themes include college

prep high school, high school for the performing arts, law enforcement program, engineering, communications, math/science, military academy, computer technology and business, electronics, drafting, ecology and environmental education, and a gifted and talented program.

....

... "Specialty schools and specialty programs will be racially balanced at the countywide proportion plus or minus five percentage points."

....

... [f]aculty from all three districts [will be] recruited to teach in the specialty schools, and teachers accepting interdistrict assignments [will] maintain contractual relationships with their home districts but that they [will] be subject "to all other rules and procedures applicable to the schools in which they teach."

After the matter was returned to the District Court, the subject of magnet schools was considered and debated by the parties. The court held a number of hearings on the subject. Finally, on February 17, 1987, the three school districts in the county advised the District Court that they had stipulated to a magnet school plan for the county and that the plan had been approved by a Magnet Review Committee appointed by the District Court. The stipulation stated that the three magnet schools heretofore established by LRSD would continue in existence and that students currently attending those schools would have a right to complete the programs in which they were enrolled. The parties agreed to the immediate establishment of three additional magnet schools and agreed that any party could present applications for additional magnet schools or programs not later than the beginning of each school year preceding the proposed year of implementation. Under the plan, there were initially to be four elementary magnets, one junior high magnet and one senior high magnet, all to be located in LRSD. Set forth below is a list of the schools, the programs, the enrollment and the proportion of the enrollment allocated to each of the three county school districts:

| Magnet Schools | | Initial Projection | | Final Projection of Feb. 23, 1987 |
|---|---|---|---|---|
| **ELEMENTARY** | | | | |
| Booker | – fine arts | 720 | | 478 |
| Carver | – basic skills, math, science | 475 | | 478 |
| Gibbs | – foreign language, international studies | 348 | | 348 |
| Williams | – basic skills | 530 | | 432 |
| | | 2,073 | | 1,736 |
| **JUNIOR HIGH** | | | | |
| Mann | – math, science, arts | 975 | | 1,194 |
| **SENIOR HIGH** | | | | |
| Parkview | – arts, performing arts | 1,150 | (Dunbar) | 792 |
| | TOTAL | 4,198 | | 3,722 |

**Allocation of Magnet Seats**

| | | | |
|---|---|---|---|
| Little Rock (shadow students – those living close to a magnet) | 931 | | |
| (plus 43% of remainder – 2,791) | 1,200 | | 2,131 |
| Pulaski County (40% of 2,791) | | | 1,116 |
| North Little Rock (17% of 2,791) | | | 475 |
| | | | 3,722 |

Under the agreement, and consistent with our en banc decision, the state was to pay one-half of the actual cost of the construction or renovation of magnet schools, as well as the customary state aid, and one-half of the cost of educating the magnet students attending these schools.

The State agreed to underwrite the entire actual cost of transporting magnet students, including the cost of transporting

*Id.* at 430–31.
NLRSD suggested that ten to twelve magnet schools be established:
  ... an interdistrict magnet school program and an interdistrict majority-to-minority (m-to-m) student transfer program to promote desegregation in the three districts. Ten to twelve magnet schools, which would offer programs such as computers, math and science and back-to-basic fundamental schools, would be located in central Little Rock.
  *Id.* at 432.

these students for extra-curricular activities. Each magnet school was to have a student population of 50% black and 50% non-black. At the elementary level, each district agreed to allocate its seats in proportion to the racial ratio present in that district at that level. At the secondary level, each school district was to allocate its seats on the basis of 50% black and 50% non-black.

The seat allocations were not to be made to a particular school but only by school level, i.e., elementary, junior high and senior high. If there is an oversubscription to a magnet school by race, grade or school, each district could make a recommendation to the Magnet Review Committee for its approval of the actual distribution of seats. Each district was to establish an open enrollment policy for magnet schools and was to be permitted to determine how children would be selected for magnet seats allocated to each district. Importantly, particularly for the purpose of this appeal, the agreement provided:

> In the event there are unused seats by any district then persons on waiting lists to attend from the other districts shall be permitted to attend before any seat is left vacant.[21]

Finally, it was agreed that the daily administration and operation of the magnet schools would be the responsibility of the host district.

The District Court approved the stipulation, *Little Rock*, 659 F.Supp. at 363, and the magnet school plan went into effect at the beginning of the 1987–88 school year. As might be expected, problems relating to enrollment arose. Most importantly, for the purposes of this appeal:

1. Neither PCSSD nor NLRSD were able to meet their enrollment goals. Thus,

some of the seats allocated to those districts were unused.

2. Fewer white students than allocated enrolled in the magnet schools from PCSSD and NLRSD.

In July of 1987, the Little Rock School Board met and determined that, if LRSD admitted all of the white Little Rock students on the waiting list (as the agreement required it to do), several of the non-magnet schools in the school district would more than likely become racially identifiable. It also believed that if the vacant seats, particularly at the elementary level, were filled by Little Rock students, the magnets would lose their interdistrict character and would be perceived as LRSD magnets. It finally reasoned that if LRSD accepted more than its assigned quota of students, some students from other districts would be blocked for a number of years from enrolling in the magnets, because the plan contemplated that, once a student enrolled in a magnet school, he or she should be permitted to complete his or her education in that school.

At this point, NLRSD moved the District Court to enter an order finding LRSD in civil contempt for failure to abide by the District Court order approving the stipulation. NLRSD stated that vacancies existed and LRSD was not living up to its obligation to accept students on the waiting list and that NLRSD would incur substantial financial obligations if the vacancies were not filled. The District Court ordered an immediate hearing. At that hearing, NLRSD introduced evidence to support its view that LRSD had refused to admit students on the waiting list and that LRSD should be held in contempt for this refusal.[22]

---

21. Any district which did not provide a student to fill an allocated seat not occupied by another student would be required to pay to the host district as its full liability for the unfilled seat the per pupil cost of the host district's debt service payment, both principal and interest, for the construction and renovation of the schools in the magnet program.

22. NLRSD had subpoenaed white parents who lived in the LRSD who wanted to enroll their

children in one of the magnet schools and who had been denied that opportunity at least by the date of the hearing. Each of the white parents that testified made it abundantly clear that they considered the magnet schools to be superior to the schools to which their children had been assigned, and some of the witnesses testified that they considered any school with an overwhelming black population to be inherently unequal. They stated that, unless their children

LRSD, on the other hand, called several members of its Board, who repeated the concerns previously expressed at Board meetings. Each Board member testified that the Board did not intend to ignore or violate the terms of the stipulation, but, rather, intended to take the matter to the Magnet Review Committee and ask that committee to address their concerns and then to bring the problem to the District Court for final resolution.

After extensive hearings, the District Court, in an order dated August 7, 1987, held:

> From the May 22 hearing to this day, LRSD has yet to ask that this court modify these orders. Assuming LRSD plans to file a motion to modify the orders pursuant to Rule 60(b), that Rule clearly states that orders remain in effect until modified. This court cannot and will not *sua sponte* modify these orders. The July 15 release date had already passed two weeks prior to the board's July 30 vote to seek modification. Consequently, the LRSD is technically in civil contempt of these court orders. Rather than energetically and diligently complying with the orders, the LRSD voted to ask for modification after the first release of seats was a *fait accompli*. I do not find the failure to be intentional or willful on the part of any board member. However, as explained, *supra*, intent is irrelevant to the issue of civil contempt.
>
> Although the LRSD is technically in contempt, I find it inappropriate to tax costs or attorneys fees. I am confident that LRSD will immediately move to comply. However, the LRSD Board, the LRSD administration and its attorneys are put on notice that I will regard as extremely serious, subject to severe sanctions, any further delay in the implementation of the orders previously issued in this case with regard to magnet schools. In accordance with Orders previously in effect, eighty per cent (80%) of the unfilled PCSSD and NLRSD magnet seats shall be filled by LRSD applicants

could attend magnet schools, they would send

in such proportion as to result in a 50–50 black to white ratio. Since the opening of school is less than a month away, the parents of the affected children shall be *immediately* notified of the assignments.

LRSD appeals from the order finding it in civil contempt and asks this Court to address the concerns that it raised before the District Court.

### B. *District Court's Contempt Order*

We agree with the District Court that the LRSD should have gone before the District Court and asked for modification of the agreement before deciding to ignore or violate the order, even if only for a short period of time. The finding of civil contempt is affirmed. We also agree with the District Court that the violation was a technical one. We, therefore, hold that the District Court did not abuse its discretion in failing to tax costs and attorneys fees to LRSD.

### C. *LRSD's Concerns with Respect to Magnet Schools*

Having said this, we believe it necessary for this Court to address the concerns that have been raised by LRSD, because they are real concerns that must be resolved by the school districts, the Magnet Review Committee, and, if necessary, the District Court. Initially, we restate our view that the magnet school population should be interdistrict in nature and racially balanced. In this respect, we do not disagree with the District Court's order that individual schools can be 55% black without violating this Court's en banc decision. To maintain the interdistrict nature of the program: the magnet schools must be recognized throughout the county as truly high quality schools, with excellent teaching staffs and unique programs of interest to suburban and city students alike; a vigorous program of recruitment must be maintained throughout the county; and applications for additional magnet programs in schools should be considered pursuant to the stipulation.

them to private schools.

There remains the question of whether we should set aside the stipulation and court order insofar as they require a magnet school with vacancies to accept students from the host district on a waiting list. We will not set the order aside at this time, but we find merit in the argument advanced by LRSD that this requirement may, unless modified, defeat the interdistrict character of the magnets and make it very difficult to maintain the agreed-to racial balance. The Magnet Review Committee, the parties, and the District Court should give careful consideration to this problem.

### D. *The Joshua Intervenors' Concerns*

The Joshua Intervenors make two additional contentions with respect to the magnet schools. They argue that the $3100 per pupil cost figure established by the District Court as the maximum that can be spent for the current magnet school program should be set aside as arbitrary. We believe this to be unnecessary. The figure was agreed to by the three school districts and the State for a single year. All parties agree that in future years the Magnet Review Committee will determine the cost per pupil necessary for the magnet program and will, subject to the court's approval, use adjusted cost figures.

The Joshua Intervenors also argue that the decision of the District Court denying them membership on the Magnet Review Committee should be reversed. The District Court, however, was simply following the language of this Court's opinion, *see* 778 F.2d at 436, in refusing them membership. We are now persuaded that the Joshua Intervenors should be permitted to designate a person to serve as a voting member on the Magnet Review Committee. As representatives of the class whose constitutional rights have been violated, they are entitled to representation, and we direct that the District Court, on remand, enter an order to that effect.

The Joshua Intervenors also question that portion of the decree that provides that no transfer of a student to a magnet school shall, by reason of its effect on the racial balance of a non-magnet transferor school, be taken to violate the provisions of the remedial decree or of the Constitution. We agree that this provision may have troublesome implications, and we direct the District Court, on motion of any party and after appropriate notice and hearing, to reexamine it carefully.

### E. *Teacher Association Concerns with Respect to Assignment of Teachers to Magnet Schools, Bargaining Agreements, and the Magnet Schools*

On May 13, 1987, the District Court entered an order, 660 F.Supp. at 637, in which it stated that teacher assignments to magnet schools shall be based on the desires of the individuals to teach in that magnet school and their competency to teach the given subject matter. It stated that transfers should be freely granted, that staffing should be made after consultation with the principal and the Magnet Review Committee, that any competent teacher desiring to remain at a magnet school shall be retained, and that the Magnet Review Committee should be consulted on the staffing of all magnet schools. The District Court believed that such teachers were available within LRSD and PCSSD but authorized the hiring of additional teachers if they were not. 660 F.Supp. at 635.

On May 26, 1987, the District Court issued another order relating to the magnet schools which essentially repeated the principles stated in its first opinion on this subject, and went on to set forth in more detail the procedures to be followed in hiring teachers for the magnet schools. It added the criterion that each magnet school certified staff be not less than 25% black nor more than 50% black in the 1987–88 school year. Finally, on July 2, 1987, it entered the third order relating to the magnet schools and again reiterated the principles previously stated.

On appeal, the classroom teachers associations argue that the broad authority given to the Magnet Review Committee creates a district within a district and that the court order abrogates the rights of the

classroom teachers under their collective bargaining agreements. We cannot agree. In our view, the District Court order outlining the duties and responsibilities of the Magnet Review Committee was well conceived.[23] It recognizes the interdistrict character of the magnet school program and carefully allocates responsibilities between the Magnet Review Committee and the host district. We would add that our review of the record leaves us with the firm impression that the members of the Committee are well qualified and have acted in the best interests of all the students with little evidence of parochialism on their part. We specifically agree with the court's order with respect to the procedures to be followed in recruiting and hiring faculty for the magnet schools and the part that the Magnet Review Committee is to play in staffing operation. We do, however, make it clear that the collective bargaining agreements between host school districts and the classroom teachers associations remain applicable to the extent that such agreements are not inconsistent with the responsibilities heretofore given to the Magnet Review Committee or with orders of the District Court with respect to the staffing of magnet schools.

## VI. TEACHER ASSIGNMENTS IN LRSD

### A. *Background*

The Little Rock Classroom Teachers Association, the Pulaski Association of Classroom Teachers, and the North Little Rock Classroom Teachers Association represent the teachers of their respective school districts. Each of the associations has entered into a collective bargaining agreement with the school district whose employees each represents. These collective bargaining agreements deal with a broad range of issues, including salaries, fringe benefits, seniority, assignments and promotions. The associations contend on appeal that the District Court has entered a series of orders which impermissibly modify or abrogate the terms of the collective bargaining agreements currently in effect between the associations and the school districts.

■ A District Court exercises broad remedial authority in dismantling segregation. *See Swann,* 402 U.S. at 15, 91 S.Ct. at 1275. This power, however, is limited by the principle that "federal courts must take into account the interest of state and local authorities in managing their own affairs, consistent with the constitution." *Morrilton School District No. 32 v. United States,* 606 F.2d 222, 229 (8th Cir.1979), *cert. denied,* 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980) (citing *Milliken II,* 433 U.S. at 280–81, 97 S.Ct. at 2757–58).

■ The remedial authority of the District Court empowers it to alter or, in the extreme case, abrogate a collective bar-

---

**23.** The District Court stated in its order of July 2:

> [T]he role of the MRC is to make recommended policy decisions regarding the operation of the magnet schools. Those decisions should then be communicated, in a written report, to the court for approval. The report should reflect the process used to reach decisions and should reflect independent fact-finding. Objections to MRC reports should be filed with the court within 20 days, after which the court will approve, modify or reject the MRC's recommendations.
>
> * * * * By way of example, in selecting staff, the MRC should set the criteria to be used or process by which teachers are selected for magnet schools; the host district would implement that policy by appropriately selecting the teachers.
>
> With respect to seat allocation, the MRC should establish a policy for seat allocation within the bounds of the stipulation which will maximize participation in the magnet schools from all three districts. Each district should set its criteria for selection of its students for magnet schools to enhance its desegregation efforts. * * *
>
> *     *     *     *     *     *
>
> The MRC must play an integral role in the budgeting process. For the 1987–88 school year the stipulated figure of $3100 per student will apply. In the future, the MRC should work with the host district in arriving at a recommended budget. That budget should then be submitted for court approval. In the event agreement cannot be reached, the MRC should submit its recommended budget to the court, as with other MRC reports, according to the procedure outlined above. Objections or recommended modifications may then be timely filed by any party.

gaining agreement which perpetuates segregation or impedes a desegregation plan. *Cf. Liddell v. Board of Education,* 822 F.2d 1446, 1458 (8th Cir.1987) (court created entity has power to make certain teacher staffing decisions). The agreements between a school district and a teachers organization, however, must be permitted to stand if they do not adversely impinge on these constitutionally mandated remedies. *See Morrilton,* 606 F.2d at 229. Any modification or abrogation can only be made after an evidentiary hearing and upon a finding that the change is essential to the desegregation remedy. With these legal principles in mind, we turn to the specific issues raised by the teachers associations.

### B. *The LRSD Teacher Assignment Plan*

During the fall and winter of 1986–87, the Little Rock Classroom Teachers Association (LRCTA) and LRSD negotiated a teacher reassignment policy. They entered an agreement on March 2, 1987, under which about 80% of the teachers were to be reassigned to achieve desegregation, to accommodate a partial grade structure reorganization, and to balance the teachers in each school with respect to age, sex, education, and experience. An appeals procedure was established for teachers who objected to being reassigned.

On March 20, 1987, the District Court sua sponte issued a letter order in which it stated that it had come to the court's attention that a massive reassignment of teachers was in progress. It directed LRSD not to engage in reassignments of that magnitude. Pursuant to that order, the agreement was modified so that only 50% of the teachers would be reassigned. The revised policy still called for the balancing of faculty at each school site, not only as to race but also as to age, sex, education and experience.

On April 15, 1987, the District Court directed LRSD to show cause why it should not be found to have violated the March 20th order. At a hearing on April 29, LRSD revealed that the LRSD Board had again changed its faculty assignment plan. Instead of having 50% of the faculty reassigned, LRSD planned to retain at least 80% of the faculty at each school. On May 26, the District Court explained its view that the old teacher assignment plan would dilute the importance of race in the school assignment process (a factor the court stated was of continuing importance in the desegregation process) and would make it difficult for parents to exercise an informed choice under LRSD's plan for student assignments. It stated that this new policy was very close to the remedial measure ordered on April 15, 1987. It then stated:

> To ensure that there is no further misunderstanding of this teacher assignment order, LRSD is to have in my hands by May 18, 1987, the name and race of every senior high and junior high teacher reassigned from his/her present school, the school to which the teacher is assigned and the reason for the reassignment.

660 F.Supp. at 643.

The District Court decreed that 80% of the staff were to be retained at junior and senior high schools, with the exception of the magnet schools, and that steps must be taken to reassign as many teachers as necessary in those schools to bring each such school to the 80% retention level. It directed that requests for transfers by primary and intermediate school teachers be honored. *Id.* at 644.

With respect to schools annexed by LRSD from PCSSD, the PCSSD teachers who had been offered employment by LRSD were to be assigned to the annexed school where they had been teaching. (Special orders were issued with respect to the J.A. Fair School.) If the reassignment caused a retention rate of more than 80%, some staff could be involuntarily transferred on a seniority basis. *Id.*

LRCTA appeals the District Court orders. It initially recognizes that the District Court plan will be fully implemented before this Court can decide the issue and that a reversal of the District Court would result in disruption within the school dis-

trict. It accepts the proposition that a collective bargaining agreement must yield when necessary to remedy a violation of federal civil rights. It urges this Court not to reverse the District Court order but to hold that the District Court erred by exceeding the scope of its remedial authority. It argues that with such a remedy, desegregation in the three school districts in Pulaski County can continue to move forward with the unnecessarily intrude upon their contractual rights with respect to educational policy.

We appreciate the fact that LRCTA does not ask this Court to reinstate the assignment policy agreed to by the association and LRSD. Such an act would unduly disrupt the education of the children. We hasten to add, however, that the authority of a federal court to alter or modify collective bargaining contracts in school desegregation cases must be based on a finding that the alteration or modification is necessary to further the effort to integrate the schools in question. *See Morrilton*, 606 F.2d at 228–29. Here, unfortunately, no such findings preceded the issuance of the March and April orders, and the findings preceding the May order hardly justify the broad order issued by the District Court. As matters now stand, the present teacher assignment policy in the non-magnet schools in LRSD will remain in effect for the balance of the 1987–88 school year. The associations have given no indication that they intend to insist on the enforce-ment of the collective bargaining agreement for the 1988–89 school year and beyond. Nor have they indicated satisfaction with the extension of the current policy beyond the 1987–88 school year. Under these circumstances, we are not in a position to determine how a teacher assignment policy will affect desegregation. We simply state that if any of the school districts agree to a teacher assignment plan with an association, the District Court must conduct an evidentiary hearing and make careful findings before setting the agreement aside. And it should do so only if the agreement impedes, disrupts or interferes with the comprehensive plan to desegregate the schools of Pulaski County.[24]

### C. *Seniority of PCSSD Teachers*

As a result of this Court's order realigning the boundaries between LRSD and PCSSD the latter school district found it necessary to lay off approximately 381 teachers in April, 1987. It did so in reverse order of their seniority.

Meanwhile, the teachers associations of LRSD and PCSSD entered into an agreement to arbitrate the question of seniority of teachers from the PCSSD to be employed by LRSD. The parties were unable to agree as to the framing of the precise issue and left this question to the arbitrator.

The District Court, upon learning of the decision to arbitrate the seniority question, entered an order on May 13, 1987,

---

**24.** On April 28, 1987, the District Court granted the motion of four teachers, Becky McKinney, Mary J. Gage, Janice Dent, and Joyce Pearson (the McKinney Intervenors) to intervene in this suit. The McKinney Intervenors reside in Pulaski County and teach in either LRSD or PCSSD; none belongs to any teachers association which has been a party to this suit since 1984. The McKinney Intervenors contended that the teacher associations could not adequately represent their interests on the issue of teacher reassignments in LRSD.

The teacher associations appeal the District Court order allowing intervention. They argue that the District Court erred by not holding a hearing and by not making specific findings of fact before granting the McKinney Intervenors' motion to intervene. They also contend that the teacher associations adequately represent all teachers because all teachers were affected by the transfers and that any disagreement on this issue should have been considered at a hearing.

We agree that a hearing should have been held and the District Court should have made factual findings on this issue. *See United States v. Crucial*, 722 F.2d 1182, 1190 (5th Cir.1983). However, it is not necessary to remand to the District Court for a hearing. The issue which concerns the McKinney Intervenors most—the March 2d Agreement—has been resolved in this appeal. With the resolution of that issue, the need for their intervention has come to an end. If the McKinney Intervenors should again believe that their interests are not being adequately represented by the Knight Intervenors, they can again move to intervene and the District Court can conduct a hearing, make factual findings, and decide the propriety of intervention at that time.

in which it held that the agreement transferred to an arbitrator an issue which was clearly embraced in its memorandum and which should be decided by it. The Court stated:

> The following policy on seniority shall apply to those teachers from PCSSD who will be employed to work in the LRSD beginning in the fall of 1987. After the second year of employment by LRSD, a staff member will obtain one-third of his/her seniority acquired in PCSSD, which will be added to the two years of employment in the LRSD. At the end of the fourth year of employment, another one-third of the seniority acquired in PCSSD will be obtained. At the end of the fifth year, the remaining years of seniority in PCSSD will be obtained. In summary, after five years of employment in LRSD, all the years of seniority in PCSSD will be added to the five years spent in LRSD and the sum of these two figures will represent that individual's seniority.

*Little Rock,* 660 F.Supp. at 645.

We are unable to find support in the record for the District Court's decision. The collective bargaining representatives of the PCSSD teachers and the LRSD teachers agreed to arbitrate. The sole issue before the arbitrator was to be the relative seniority of LRSD teachers and the newly hired PCSSD teachers. The record does not reveal that racial considerations should or would be a factor in the decision, just as it does not reveal why the decision of the District Court with respect to seniority either contributed, or failed to contribute, to the desegregation of the two school districts involved in the arbitration. The decision of whom to hire and where to initially assign the former these decisions in accordance with this Court's mandate and District Court orders.

On remand, then, the District Court's order of May 13th will be vacated insofar as it relates to the seniority issue, and the parties shall promptly proceed to arbitrate that issue, unless the parties can resolve the dispute through negotiation.

## D. *PCSSD Recall of Teachers*

■ The teacher associations appeal from a July 8, 1987 decision of the District Court which permitted PCSSD to recall black teachers who had been laid off in larger numbers than white teachers as a result of boundary realignments between LRSD and PCSSD.

The facts are accurately stated by the District Court. We summarize them here.

In an earlier decision, the District Court found PCSSD liable for a number of segregative acts, including the failure to meet black staff hiring goals ordered in *Zinnamon v. Board of Education of Pulaski County Special District,* No. LR–68–C–154 (E.D.Ark.1973). We affirmed that decision in *Little Rock,* 778 F.2d at 420–21. PCSSD complied with those decisions in its present desegregation plan under which the percentage of black staff equals the percentage of black students. However, when PCSSD laid off the 381 teachers in April, 1987, due to the school district boundary realignment, black teachers were laid off in disproportionate numbers due to the recency of their hiring. PCSSD sought the District Court's permission to recall a larger number of black teachers on a basis other than seniority.

LRSD, the Joshua Intervenors, and the teachers associations opposed the PCSSD motion. LRSD objected on the grounds that if PCSSD were allowed to rehire affirmatively all its black teachers, LRSD would be forced to fill its vacancies from an all-white pool of laid off PCSSD teachers. The Joshua Intervenors urged the District Court to deny PCSSD's motion and suggested as an alternative that laid-off black teachers be hired in equal numbers by LRSD and PCSSD, thereby allowing each district to meet its hiring goals. The teachers associations objected to affirmative recall on the ground that such recall would violate the equal protection clause of the Fourteenth Amendment, as interpreted in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). The District Court held:

The relevant question at this juncture is not whether affirmative recall of blacks is permissible in light of the PCSSD's correlation of minority students to staff, but rather whether affirmative recall of blacks is sufficiently narrow to remedy the disparate impact that court-induced layoffs had on black teachers in PCSSD. In a promotion case, the relevant labor market consists of the current employees; in a recall situation, the relevant labor pool consists of those teachers who have been laid off and are awaiting recall. It is not the percentage of qualified blacks in the labor market seeking employment since, by contract with its teacher union PCSSD must recall laid off teachers before hiring new personnel. The proper analysis, then is a comparison between the numbers of black teachers to white teachers before layoffs, and the numbers of black teachers to white teachers after the layoffs.

After applying the criteria set out in [*U.S. v. Paradise*, —— U.S. ——, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987)], to the current situation, I am convinced that permitting PCSSD to recall affirmatively its black staff members to the extent they were disproportionately laid off is not only justified, but necessary to prevent yet another tragic irony in this case, that is, that the desegregation orders of this court and the Court of Appeals would directly cause blacks to shoulder a disproportionate burden in job layoffs. Nothing short of this one-time affirmative recall can remedy that effect.

We agree with the District Court for the reasons given by it. We additionally note that all teachers who taught at PCSSD prior to the boundary line changes mandated by this Court and who have made application for employment have now been employed by either PCSSD or LRSD. Under these circumstances, we believe that the District Court's order was narrowly tailored to ensure that the previously mandated goals for a desegregated faculty have been met.

## VII. ANNEXATION

The Joshua Intervenors appeal the District Court's approval of the annexations of five small parcels of land in PCSSD by NLRSD. We affirm the District Court.

Parents of thirty white students petitioned the PCSSD Board and the NLRSD Board for annexations of property in PCSSD to NLRSD pursuant to Arkansas Act 549 of 1987. The Act places a number of restrictions on annexations. Important to this appeal is a provision that the annexing district must contain a higher percentage of minority students than the district losing territory.[25] Each Board held a hearing. The Joshua Intervenors raised no objections at either of the hearings.

On August 6, 1987, NLRSD filed a petition in federal District Court for approval of the annexations. The District Court approved them the same day without receiving responses by any other party and without a hearing. The Joshua Intervenors filed a motion for reconsideration, arguing that the District Court should only conditionally approve the annexations, subject to a reassignment of the thirty students, if needed, to achieve a constitutionally required level of desegregation. The District Court denied the motion on October 6, 1987.

We find that the District Court did not abuse its discretion in denying the motion. Clearly, the District Court would have to reject the applications had it been shown that to do otherwise would frustrate the implementation of a constitutionally mandated desegregation remedy. *See, e.g., Wright v. Council of the City of Emporia*, 407 U.S. 451, 460–61, 92 S.Ct. 2196, 2202–03, 33 L.Ed.2d 51 (1972); *Haney v. County Board of Education of Sevier County*, 410 F.2d 920, 924 (8th Cir.1969). A hearing would generally be proper to resolve the

---

**25.** In addition, the petitioners must own property located wholly within an incorporated town; the annexing school district must be within the town; the property to be annexed and the territory of the annexing school district must be contiguous; the property to be annexed cannot be larger than five thousandths of one percent of the total territory of the district losing the property; and the property must be residential.

question of the effect of the annexations. In this case, however, the Joshua Intervenors have not shown that the action under state law "frustrates the objective of [federal law] in some substantial way." *Edgar v. Mite Corp.,* 457 U.S. 624, 632, 102 S.Ct. 2629, 2635, 73 L.Ed.2d 269 (1982). Here, the number of students involved is minimal. For these reasons, we affirm the District Court.

## VIII. CITIZENS' COMMITTEE

On April 15, 1987, the District Court created the "Citizens' Committee" to monitor and assist in the implementation of LRSD's desegregation plan. Shortly thereafter, the Joshua Intervenors issued subpoenas in order to depose members of the Committee. On April 21, Hillary Clinton, counsel for the Committee, moved to quash the subpoenas on the basis that the depositions were improper because the Committee was judicially immune and because any evidence gathered would be inadmissible.

After ordering the subpoenas quashed, the District Court issued an order explaining the purposes of the Citizens' Committee. Those purposes included gathering comments from the community and information from the parties and monitoring the progress in the implementation of the plan. The court further directed the Committee to "assist the parties as well as the [c]ourt in resolving any problems that arise with respect to the plan." The District Court characterized the Committee as an "arm of the [c]ourt, not required to engage in formal discovery to obtain the information it needs."

The Joshua Intervenors dispute the propriety of forming such a Committee with the powers this one has and of appointing an attorney to assist it. They argue that this Committee does not serve the functions typically served by such committees— e.g., providing for minority input or expert advice.

There is not one formula for a well-conceived monitoring committee. This Committee has expertise in the areas of education, civil rights litigation, and computers, *Little Rock,* 660 F.Supp. at 645, and

the record suggests that the Committee has functioned well. The District Court was well within its discretion to devise a committee for the purposes stated by the court.

The Joshua Intervenors also contend that the Citizens' Committee acts as an improper surrogate for the District Court, allowing it to gather information and often to bypass the parties. We find no significant problem in the delegation of powers to the Committee. The District Court clearly intended that the parties would still have an opportunity to object to any information submitted to it, and thus far the parties have had such an opportunity.

Although the District Court refers to the Committee as an "arm of the court," this statement clearly does not and cannot mean that the Committee was to have the powers of the court. The primary concern of the District Court was to ensure the Committee's ability to gather information by not subjecting the Committee to formal discovery requirements. The creation of such a Committee was well within the court's discretion.[26] *See, e.g., Liddell v. Caldwell,* 546 F.2d 768, 774 (8th Cir.1976) *cert. denied,* 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977); *Harrington v. Colquitt County Board of Ed.,* 446 F.2d 1011, 1012 (5th Cir.1971) ("bi-racial monitoring committee to advise with the parties and with the District Court"); *Morgan v. McDonough,* 540 F.2d 527 (1st Cir.1976), *cert. denied,* 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977) (order placing South Boston High School in receivership).

## IX. CONCLUSION

The mandate of this Court shall issue forthwith. The case is remanded to the District Court for action consistent with this opinion. To the extent that their positions have been adopted by this Court, the Joshua Intervenors and LRSD are prevailing parties on this appeal. They may file requests for an award of costs and attorneys' fees within the time allowed by 8th Cir.R. 17. Any other party which believes itself entitled to such an award may also

---

**26.** The appointment of counsel to the Committee was also proper. Clearly her function was

not to act as a formal advocate but, rather, as a legal advisor.

file such a request. (Motions for fees previously filed need not be filed again.) Parties desiring to oppose any motion for fees and costs may file objections within 15 days after the filing of the motion.

It is so ordered.

## APPENDIX 1

### Racial Composition of PCSSD Schools
### Under the January and March Plans

#### I. North of River

| A. Elementary Schools | School Year 1986–87 | % Black Proposed under January Plan | % Black Proposed under March Plan |
|---|---|---|---|
| Adkins | 40% | 30% | 35% |
| Arnold Drive | 13% | 20% | 15% |
| Bayou Meto | 3% | 0% | 1% |
| Cato | 4% | 21% | 18% |
| Dupree | 29% | 20% | 18% |
| Harris | 45% | 32% | 31% |
| Jacksonville | 26% | 23% | 27% |
| Oakbrooke | 16% | 22% | 18% |
| Oak Grove | 12% | 20% | 11% |
| Pine Forest | 13% | 22% | 12% |
| Pinewood | 26% | 21% | 23% |
| Scott | 35% | 38% | 32% |
| Sherwood | 23% | 25% | 20% |
| Sylvan Hills | 16% | 20% | 21% |
| Taylor | 27% | 19% | 23% |
| Tolleson | 18% | 19% | 15% |

**B. Junior High**

| | | | |
|---|---|---|---|
| Jacksonville North | 29% | 20% | 21% |
| Jacksonville South | 29% | 20% | 22% |
| Northwood | 7% | 20% | 14% |
| Oak Grove* | —— | 21% | 10% |
| Scott | 36% | 32% | 29% |
| Sylvan Hills | 16% | 21% | 16% |

**C. Senior High**

| | | | |
|---|---|---|---|
| Jacksonville | 28% | 19% | 21% |
| North Pulaski | 8% | 22% | 15% |
| Oak Grove* | 10% | 20% | 11% |
| Sylvan Hills | 13% | 18% | 14% |

#### II. Southeast Quadrant

**A. Elementary Schools**

| | | | |
|---|---|---|---|
| College Station | 73% | 39% | 56% |
| Cook | 60% | 39% | 55% |
| Fuller | 40% | 39% | 56% |
| Landmark | 25% | 40% | 54% |
| New School | —— | 42% | 56% |

**B. Junior High**

| | | | |
|---|---|---|---|
| Fuller | 43% | 34% | 51% |

**C. Senior High**

| | | | |
|---|---|---|---|
| Mills | 39% | 32% | 50% |

#### III. Southwest Quadrant

**A. Elementary Schools**

| | | | |
|---|---|---|---|
| Baker | 3% | 33% | 12% |
| Lawson | 0% | 32% | 11% |
| Robinson | 15% | 36% | 13% |

**B. Junior High**

| | | | |
|---|---|---|---|
| Robinson Middle | 12% | 22% | 10% |

**C. Senior High**

| | | | |
|---|---|---|---|
| Robinson | 12% | 24% | 10% |

* Oak Grove is a combined junior and senior high school. For the present school year data detailed above, all students attending that school are counted as senior high school students.